STATE OF NORTH CAROLINA     IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
COUNTY OF IREDELL     FILE NUMBER 21 CVS 486

FILED 2021 FEB 23 P 4:31
IREDELL CO., C.S.C.

Eric Michael Callicutt Keenan,

    Plaintiff,

v.

Town of Mooresville,

    Defendant

Complaint
(Jury Trial Demanded)

COMES NOW the Plaintiff, Eric Michael Callicutt Keenan, by and through the undersigned counsel, who does allege and say of the Defendant Town of Mooresville as follows:

## PARTIES

1. Plaintiff Eric Michael Callicutt Keenan (hereinafter "Keenan") is an individual and resident of Cabarrus County, North Carolina and was employed by Defendant Town of Mooresville within the State of North Carolina.

2. Defendant Town of Mooresville is a municipality organized pursuant to the laws of the State of North Carolina and is incorporated within Iredell County.

## JURISDICTION AND VENUE

3. The North Carolina General Courts of Justice have personal jurisdiction over the Defendant by virtue of the Defendant's residency within this State and by the virtue of the incidents giving rise to this complaint having occurred within this State.

EXHIBIT 1

4. The North Carolina General Courts of Justice have subject matter jurisdiction over this action.

5. The Superior Court Division of the North Carolina General Court of Justice in operation in Iredell, North Carolina is an appropriate and proper forum for this action, as said county is the county in which Plaintiff resides.

## FACTS ALLEGED

6. Keenan was employed by Defendant Town of Mooresville's Police Department (hereinafter the "Mooresville Police Department") at all times relevant to this Complaint and Defendant Town of Mooresville exercised control over Keenan's schedule, set the terms and conditions of his pay, and established the requirements and standards for his job performance.

7. Keenan began his employed with the Mooresville Police Department on or about March 28, 2016.

8. Keenan was, at all times relevant to this Complaint, the only openly gay male officer employed by the Mooresville Police Department.

9. Keenan fulfilled the expectations of his employer to a satisfactory standard, and was without any form of official reprimand, from his hiring on March 28, 2016 until July of 2017.

10. In May of 2017, and continuing substantially thorough July of 2017, Keenan's husband was hospitalized for an extended period of time due to a major health issue. Accordingly, Keenan began taking time off to care for his husband in accordance with the Family and Medical Leave Act (hereinafter "FMLA").

11. During this time period, Major Gerald Childress[1] (hereinafter "Childress"), an employee of the Mooresville Police Department, made several calls to Keenan inquiring about how much time Keenan intended to take off to care for his husband.

12. On July 5, 2017, after utilizing his right to time off under FMLA, Keenan had returned to work and witnessed an individual on motorcycle using flashing blue lights and forcing other vehicles to pull over to the shoulder.

13. Keenan turned on his own blue lights and attempted to pull over the individual but ultimately had to abandon such attempt due to dangerous actions taken by the motorcycle driver which posed a danger to himself and the public.

14. Keenan was justified in initiating the pursuit under then existing policy as Keenan had probable cause to believe the individual on the motorcycle had committed a felony by impersonating an officer and was a potential danger to the community.

15. Despite this, Childress made the determination that Keenan had violated official policy of the Mooresville Police Department and "counseled" Keenan.

16. Under the, then existing, policy of the Mooresville Police Department, an officer who has been "counseled" results in the creation of a "Counseling Record" stating the reason for the counseling and the action taken to correct the alleged violation of policy.

---

[1] Major Gerald Childress, and several other individuals mentioned in this Complaint, have subsequently been promoted, demoted, transferred, and/or retired from their position with the Mooresville Police Department. Such promotions, demotions, transfers, and retirements are, unless otherwise stated, immaterial to the substantive allegations of the complaint and each individual is referred to by their rank at the time of each respective incident.

17. The, then existing, policy of the Mooresville Police Department was to treat Counseling Records as irrelevant for purposes of personnel decisions after one-year has eclipsed from the date of the counseling.

18. Childress applied a different standard of appropriateness in his review for initiating a pursuit against Keenan then was applied against other members of the Mooresville Police Department.

19. In particular, the relevant written policy is ambiguous as to whether impersonating a police officer satisfies the standard of a serious felony involving the infliction, attempted infliction, or threatened infliction of serious physical harm to a person that justifies a vehicle pursuit.

20. The Mooresville Police Department had previously indicated that similar incidents justified a pursuit.

21. On information and belief, Childress treated Keenan differently due to his sexual orientation.

22. On October 17, 2017, Keenan was providing security at a high school football game when a group of middle school aged students became engaged in a fight.

23. Another officer, Corporal Gallagher, arrived at the scene of the fight and attempted to break up the fight. Corporal Gallagher was quickly surrounded by a large group of middle school aged students who began chanting and escalating the situation.

24. Keenan, having been trained in dispersal of groups engaged in mob mentality and drawing on similar past experiences, tossed the contents of an

unopened water bottle upon the crowd to disrupt the crowd and make them more responsive to lawful commands being issued by Keenan and by Corporal Gallagher.

25. Keenan chose such technique as it was both effective and it avoided use of other approved methods of dispersing the crowd, including using physical force to throw, slam, or plow through the middle school aged children, which Keenan believed would be ineffective and morally, if not legally, an excessive use of force.

26. Through the use of the water bottle, Keenan was able to disburse the crowd and he and Corporal Gallagher were able to restrain the fighting children without further escalation in force.

27. Shortly thereafter Childress, then in the position of Acting Deputy Chief of Police, initiated an internal affairs investigation against Keenan for excessive use of force and conduct unbecoming an officer.

28. Childress instructed Major Ron Chilton (hereinafter "Chilton") to handle the internal affairs investigation into Keenan.

29. Disregarding proper investigatory protocol, Chilton initiated a door-to-door conversation with Keenan into the alleged incident. A door-to-door conversation is one which occurs between an officer sitting in a police vehicle and an individual outside such vehicle. Door-to-door conversations lack the formality and privacy of proper investigatory procedures otherwise maintained by the Mooresville Police Department.

30. During such door-to-door conversation, Chilton stated that the main reason for concern over the use of the water bottle was a biological concern that Keenan may have drank from the bottle prior to using it to disperse the crowd.

31. Keenan confronted Chilton as to whether such concern was rooted in an assumption that Keenan, as a gay man, was assumed to have HIV or AIDS.

32. Chilton stated that he had no further comment on the subject and terminated the conversation.

33. On information and belief, Chilton's concerns were entirely related to an inappropriate and unfounded belief that Keenan, as a gay man, had either HIV or AIDS.

34. In a follow-up interview, Chilton stated that the decision was outside of his control and that he had been informed by the Chief of Police to write Keenan up for the incident.

35. At the time of the incident, Damon Williams was the Chief of Police for the Mooresville Police Department.

36. Keenan took advantage of his internal review policies and successfully had his written reprimand turned into a counseling record.

37. On information and belief, Keenan's decision to challenge the reprimand as based on inappropriate assumptions based on Keenan's sexual orientation led to officials within the Mooresville Police Department to pay special attention to Keenan and seek out an incident to justify terminating and/or punishing Keenan.

38. On November 4, 2017 Keenan worked a routine patrol in which he was actively looking for drunk or otherwise impaired drivers.

39. Keenan observed an individual in a jeep going in excess of 15 miles over the speed limit, partially occupying multiple lanes, and leaving an area with several bars.

40. Keenan turned on his flashing lights and followed the suspected impaired driver. The driver immediately sped up to avoid capture and Keenan contacted his supervisor, Seargent Darrin Furr (hereinafter "Furr"), to inform him that Keenan was beginning pursuit of the suspect.

41. The Mooresville Police Department's policy at the time was to allow pursuits of incidents with an articulable reason for suspecting that the driver was impaired due to the danger to the public of allowing such individuals to continue to drive.

42. During the pursuit, Keenan witnessed the suspect toss multiple items out the window and narrowly avoid an accident by forcing a motorist onto a curb.

43. Keenan relayed this information to Furr and was eventually joined in pursuit by Corporal Jeremy Bentley (hereinafter "Bentley"). During the pursuit, both Keenan and Bentley reached speeds in excess of 100 mph and the pursuit was eventually called off by Furr.

44. Keenan complied with Furr's decision to call of the case.

45. Furr informed Keenan on the date that the pursuit was justified and that his decision to terminate the pursuit was not related to a belief that Keenan's

original decision to initiate the pursuit was against the policy of the Mooresville Police Department.

46. On January 13, 2018, Keenan responded to a call for assistance from Officer Matthew Johnson in pursuit of a minivan. Keenan found himself in front of the pursued vehicle and attempted to move out of the lane to avoid a collision.

47. This decision coincided with the van's attempt to change lane and resulted in a scenario which, effectively, constituted a "rolling" or "stationary" roadblock.

48. Keenan's intent was not to institute a rolling or stationary roadblock.

49. Keenan's actions concededly resulted in the creation of a rolling or stationary roadblock and such roadblock was in violation of the Mooresville Police Department's policy on use of a rolling or stationary roadblock.

50. The November 4, 2017 incident and the January 13, 2018 incident were combined into a single internal affairs investigation.

51. Such investigation was conducted a full 90 days after the initial November 4, 2017 incident.

52. On information and belief, the allegations regarding the November 4, 2017 investigation were added to the investigation of the January 13, 2018 incident in order to provide a pretext for a harsher punishment.

53. At the conclusion of such investigation, Chief of Police Damon Williams suspended Keenan for two days and suspended his right to utilize a take home patrol car for 30 days.

54. In making such punishment, the Chief of Police cited the severity of the violation and progressive discipline as reasons for the form the punishment took.

55. At the time of his punishment, Keenan had not had a single written reprimand directed against him.

56. The only other written reprimand against Keenan, at that time, had been for the October 17, 2017 water bottle incident. As previously stated above, such written reprimand was overturned and reduced as a result of Keenan's exercise of the internal review process.

57. On information and belief, the real reason for the severity of such punishment was animus towards Keenan's sexual orientation.

58. Furthermore, despite Keenan receiving counseling for similar incidents, Officer Johnson was not reprimanded or punished for his decision to pursue a van for a mere speeding violation. Pursuit of a vehicle on the basis of a speeding violation alone was, at all times relevant to this complaint, a violation of the Mooresville Police Department's pursuit policies.

59. Between 2018 and his termination, Keenan lodged multiple internal complaints against Officers Tyquane White and Brett Cunningham regarding the low quality of each respective officer's work, attendance, and for pushing off of work onto Keenan and other officers.

60. Such complaints were initially heard by Captain Gaypeart Peralta (hereinafter "Peralta").

61. Upon receiving such complaints, Peralta told Keenan to "stay in his lane" and refused to follow-up or otherwise investigate the complaints as required by the policies of the Mooresville Police Department.

62. Successive complaints were reviewed by Captain Rob Coughlin (hereinafter "Coughlin").

63. On information and belief, Coughlin shared the complaints made by Keenan with Seargent David Fortson (hereinafter "Fortson").

64. On multiple occasions Coughlin and Fortson verbally responded to such complaints by informing Keenan to "stay in his lane" and not worry about other officers.

65. On each occasion, Coughlin and Fortson violated the policies of the Mooresville Police Department by failing to investigate or otherwise follow-up on the complaints made by Keenan and by failing to provide a written response to such complaints.

66. On information and belief, in response to the complaints and due to the special attention already placed upon Keenan by other members of the Mooresville Police Department, Coughlin began monitoring Keenan's activity for any excuse to discipline or terminate him.

67. On September 17, 2018 Keenan responded to an emergency call of an ongoing home invasion and breaking and entering. Keenan responded appropriately by use of his blue lights and siren and otherwise acted as he had been trained.

68. During his response to the call Keenan appropriately operated his vehicle and no complaints were filed, or property damaged, as a result of the way in which he operated his vehicle.

69. Despite the lack of complaint, Coughlin reviewed the video file and determined, on his own accord, that Keenan's actions amounted to operating a vehicle without due caution and in a reckless manner.

70. When Keenan disagreed with this assessment, Coughlin replied that that Keenan "couldn't go a single shift without violating policy."

71. On information and belief, Coughlin was actively looking for a reason to discipline, terminate, or otherwise punish Keenan.

72. Keenan reported Coughlin's comments to the internal affairs office.

73. The internal affairs office was, at this time, overseen by Peralta who, despite having corroborating evidence of such statement, took no action.

74. On February 4, 2019, Keenan was reprimanded for using his department issued laptop to send messages expressing displeasure with Officer White on the Mobile Data Terminal (hereinafter the "MDT") system.

75. The Mooresville Police Department justified such reprimand on the basis that the messages Keenan issued were not work related and would not otherwise be transmitted across radio.

76. Other members of the Mooresville Police Department similarly used the MDT to issue messages unrelated to work and that would not otherwise be transmitted across radio.

77. Outside of the individuals directly contacted by Keenan in this exchange, other members of the Mooresville Police Department were not disciplined for their use of the MDT system in a manner similar to Keenan's use of the system.

78. Throughout Keenan's employment with the Mooresville Police Department, Keenan was the target of comments implying he was of a lesser than other straight male members of the Mooresville Police Department. In particular

   a. On more than one occasion, supervisors singled out Keenan when addressing a general audience and stated that the solution to the problem presented was to "man up." On information and belief, such comments were made towards Keenan as the supervisors viewed Keenan as not fulfilling the traditional rolls associated with masculinity due to Keenan's sexual orientation.

   b. On more than on occasion both supervisors and coworkers referred to Keenan as "dramatic." None of Keenan's straight male coworkers were referred to as "dramatic."

   c. Keenan was consistently required to respond to less desirable stops and activities, regardless of if he was the closer or more experienced officer.

   d. Keenan was consistently called off from assisting in more desirable police stops or other activities, regardless of if he was the closer or more experienced officer.

79. On February 25, 2019, Keenan made a complaint to his patrol leader, the Town of Mooresville Human Resources department, and the Town Attorney of

the Town of Mooresville expressing concerns that he had been harassed and discriminated against due to his sexual orientation.

80. In addition to his complaints regarding discrimination on the basis of sexual orientation, Keenan raised complaints about unequal treatment on the basis of race.

81. In particular, during Keenan's time as an officer, Keenan experienced a racially charged environment wherein there was a more liberal use of discipline and internal affairs investigations against white officers than against black officers.

82. On information and belief, such policy was encouraged by then Police of Chief Damon Williams.

83. In fall of 2018 Keenan made a complaint about a coworker who he believed was insufficiently trained and was a danger to himself and other officers. The officer at issue in this complaint was a black female.

84. On multiple occasions between the Fall of 2017 and March of 2019, Keenan made complaints regarding another officer not sharing equitably the workload of other officers in the squad. The officer at issue in this complaint was a black male.

85. In both complaints referenced in Paragraph 83 and 84 of this Complaint, then Chief of Police Damon Williams stepped in to protect the officers at issue.

86. On information and belief, Damon Williams protected such officers and ignored Keenan's complaint on the basis that the officers complained against are black and Keenan is white.

87. Keenan was held to a higher standard than other straight members of the Mooresville Police Department.

88. Keenan was held to a higher standard than black members of the Mooresville Police Department.

89. Keenan was denied a promotion to Corporal on the basis of the disciplinary proceedings initiated against him.

90. On or about March 8, 2019 Keenan was again disciplined and such discipline led to his termination on or about March 18, 2019.

91. Rather than have such termination be reviewed by the Chief of Police or through other employees of the Town of Mooresville, Keenan's review was handled by the U.S. ISS Agency, LLC.

92. On information and belief, at no point did the Chief of Police of the Mooresville Police Department conduct a meaningful review of Keenan's situation or termination.

93. On information and belief, the investigator assigned to review Keenan's review recommended that Keenan be reinstated.

94. Despite such recommendation, Keenan was not reinstated.

95. Keenan timely filed a complaint with the Equal Employment Opportunity Commission (hereinafter the "EEOC"). Keenan's complaint was dismissed and he was issued a right to sue letter on or about November 25, 2020.

### FIRST CAUSE OF ACTION
(Discrimination on the Basis of Sex in Violation of 42 U.S.C. §2000e-2)

96. Plaintiff incorporates by reference the preceding allegations as if fully restated herein.

97. Plaintiff was employed by Defendant in an at-will capacity until his termination on or about March 18, 2019.

98. Defendant discriminated against Plaintiff on the basis of his sex, and more particularly on the basis of his sexual orientation, in violation of 42 U.S.C. §2000e-2.

99. Defendant developed pretextual reasons to discipline and ultimately terminate Plaintiff.

100. Defendant's termination of Plaintiff was and is in violation of 42 U.S.C. § 2000e through 42 U.S.C. §2000e-3.

101. Plaintiff was damaged by Defendant's actions in an amount exceeding $25,000.00, to be proven with more specificity at trial. This amount includes lost wages and compensatory damages related to the Defendant's wrongful discharge of Plaintiff.

102. The Defendant's actions as alleged in this Complaint were willful and wanton, were in reckless disregard of the Plaintiff's rights, and the Plaintiff is entitled to recover punitive damages against the Defendant pursuant to N.C. Gen. Stat. §1D-15.

## SECOND CAUSE OF ACTION
(Retaliatory Discharge in Violation of 42 U.S.C. § 12112 *et seq.*)

103. Plaintiff incorporates by reference the preceding allegations as if fully restated herein.

104. Plaintiff was employed by Defendant in an at-will capacity until his termination on or about March 18, 2019.

105. Plaintiff filed internal complaints regarding his mistreatment on the basis of sexual orientation and race.

106. Defendant retaliated against Plaintiff by assigning him to less desirable tasks and developing pretextual reasons to discipline him.

107. Defendant retaliated against Plaintiff by using the disciplinary actions, based entirely on pretextual reasons, to deny Plaintiff a promotion.

108. Defendant retaliated against Plaintiff ultimately by terminating Plaintiff.

109. Defendant's reasons for terminating Plaintiff were pretextual.

110. Defendant's discharge of Keenan was and is in violation of 42 U.S.C. § 12212, *et seq*.

111. Plaintiff was damaged by Defendant's actions in an amount exceeding $25,000.00, to be proven with more specificity at trial. This amount includes lost wages and compensatory damages related to the Defendant's wrongful discharge of Plaintiff.

112. The Defendant's actions as alleged in this Complaint were willful and wanton, were in reckless disregard of the Plaintiff's rights, and the Plaintiff is entitled to recover punitive damages against the Defendant pursuant to N.C. Gen. Stat. §1D-15.

## THIRD CAUSE OF ACTION

(Discrimination on the Basis of Race in Violation of 42 U.S.C. §2000e-2)

113. Plaintiff incorporates by reference the preceding allegations as if fully restated herein.

114. Plaintiff was employed by Defendant in an at-will capacity until his termination on or about March 18, 2019.

115. Defendant discriminated against Plaintiff on the basis of his race in violation of 42 U.S.C. §2000e-2.

116. Defendant developed pretextual reasons to discipline and ultimately terminate Plaintiff.

117. Defendant's termination of Plaintiff was and is in violation of 42 U.S.C. § 2000e through 42 U.S.C. §2000e-3.

118. Plaintiff was damaged by Defendant's actions in an amount exceeding $25,000.00, to be proven with more specificity at trial. This amount includes lost wages and compensatory damages related to the Defendant's wrongful discharge of Plaintiff.

119. The Defendant's actions as alleged in this Complaint were willful and wanton, were in reckless disregard of the Plaintiff's rights, and the Plaintiff is entitled to recover punitive damages against the Defendant pursuant to N.C. Gen. Stat. §1D-15.

## PRAYER FOR RELIEF

NOW WHEREFORE the Plaintiff does pray the Court as follows:

1. That the Plaintiff have and recover a judgment against Defendant in an amount to exceed $25,000.00, to be proven more specifically at the time of trial, which judgment shall include lost wages, lost benefits, and economic and compensatory damages as allowed by law.

2. That an award of punitive damages against the Defendant be assessed for the Defendant's willful and wanton disregard of the Plaintiff's rights pursuant to N.C. Gen. Stat. §1D-15.

3. That all issues so triable be tried by jury;

4. That the costs of this action be taxed against the Defendants;

5. That the Plaintiff recover reasonable attorneys' fees incurred in bringing this action; and

6. For such further and other relief as the Court deems just, fitting, and proper.

This is the 23rd day of February, 2021.

Pope McMillan, P.A.
Attorneys for the Plaintiff

By: _____
Clark D. Tew
N.C. State Bar No. 41632
P.O. Drawer 1776
Statesville, NC 28687
(704) 873-2131
ctew@popemcmillan.com